PEOPLE v BOLDUC

Docket No. 244970. Submitted June 2, 2004, at Lansing. Decided August
24, 2004, at 9:20 A.M. Leave to appeal sought.

Jerry J. Bolduc was charged in the 68th District Court with posses-
sion with intent to deliver marijuana, MCL 333.7401(2)(d)(iii).
The district court, Michael D. McAra, J., dismissed the charge after
finding that the police's use of the "knock and talk" procedure
resulted in a coercive, unlawful seizure of the defendant and
required suppression of evidence of the defendant's self-
incriminating statements and the marijuana he turned over to the
police. The Genesee Circuit Court, Archie L. Hayman, J., affirmed
the dismissal of the charge. The Court of Appeals, FITZGERALD, P.J.,
and COOPER, J. (GAGE, J., dissenting), denied leave to appeal for lack
of merit in the grounds presented (Docket No. 241103.) The
Supreme Court, in lieu of granting leave, remanded the case to the
Court of Appeals for consideration as on leave granted. 467 Mich
900 (2002).

The Court of Appeals *held*:

The knock and talk procedure is a law enforcement tactic in
which the police, who possess some information that they believe
warrants further investigation, but that is insufficient to consti-
tute probable cause for a search warrant, approach the person
suspected of engaging in illegal activity at the person's residence,
identify themselves as police officers, and request consent to
search for the suspected illegality or illicit items. Although the
knock and talk procedure is not unconstitutional per se, the
procedure is subject to constitutional restraints against unlawful
seizures. US Const, Am IV; Const 1963, art 1, § 11. The test for
whether the use of the knock and talk procedure results in an
unlawful seizure is whether, in view of all the surrounding
circumstances, a person would have believed he was not free to
decline to answer questions and terminate the encounter with the
police.

In this case, the defendant voluntarily admitted the police into
his home after the police knocked on the door, but the defendant
denied requests by the police to search his home and, by both
verbal and physical communication, asked the police to leave his

home. The police, however, did not leave, but prolonged the encounter by embarking on a new line of questioning about a large bulge in the defendant's pants pocket, which turned up to be $6,500 in cash. This police conduct was an indirect offer of force suggesting that the defendant would not be allowed to exercise his right to end the encounter. Moreover, because the defendant was in his home and had no other opportunity to retreat, he reasonably believed that he was not free to terminate the encounter. This inherently coercive seizure entitled the defendant to suppression of his self-incriminating statements and the marijuana, and the evidence was the fruit of an illegal seizure.

Affirmed.

O'CONNELL, J., dissented and would reverse the district court's dismissal of the charge. The facts of this case do not reflect an improper effort by police to extract a confession from the defendant after using the knock and talk procedure. The majority incorrectly concludes that a three to four minute conversation about the bulge in the defendant's pocket amounted to illegal seizure of the defendant's person. The Fourth Amendment prohibition against unlawful searches and seizures simply does not apply when the defendant voluntarily admitted the police into his home and initially offered to participate in their investigation, and the police honored the defendant's refusal to their request to search his home. Furthermore, the defendant voluntarily made self-incriminating statements and turned over the marijuana to the police. The record does not show that the police refused to leave the defendant's home or that they threatened to remain until he confessed. Rather, the police immediately left with the defendant when he volunteered to go with them to verify the source of the money. Sometime later, outside the defendant's home, he voluntarily made the self-incriminating statements and then returned to his home to turn over the marijuana to the police. On these facts, there was no coercion.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *Arthur A. Busch*, Prosecuting Attorney, *Donald A. Kuebler*, and *John C. Schlinker*, Assistant Prosecuting Attorneys, for the people.

*Law Office of Roger G. Isaac* (by *Roger G. Isaac*) for the defendant on appeal.

Before: HOEKSTRA, P.J., and O'CONNELL and DONOFRIO, JJ.

HOEKSTRA, P.J. This case is before us by order of our Supreme Court, which, in lieu of granting leave to appeal, remanded the case to this Court for consideration as on leave granted. *People v Bolduc*, 467 Mich 900 (2002). In this case, we are required to further define what is permissible conduct by the police when conducting a knock and talk procedure.[1] In *People v Frohriep*, 247 Mich App 692; 637 NW2d 562 (2001), we determined that the knock and talk procedure itself is not unconstitutional, but we also concluded that the knock and talk procedure is subject to judicial review to determine whether the particular circumstances comply with general constitutional protections. *Id.* at 697-698. The case presently before us raises the issue whether it is unreasonable, and therefore unconstitutional, for the police to prolong a knock and talk encounter at a home after the resident who is the focus of the investigation, defendant herein, has refused to grant permission to search and has directed the police to leave. The district court found that under the circumstances of this case the conduct of the police in extending the encounter with defendant was inherently coercive, and thus the district court suppressed evidence of defendant's incriminating statements and the marijuana that defendant turned over to the police. The circuit court affirmed. We conclude that the district

---

[1] In general, "the knock and talk procedure is a law enforcement tactic in which the police, who possess some information that they believe warrants further investigation, but that is insufficient to constitute probable cause for a search warrant, approach the person suspected of engaging in illegal activity at the person's residence (even knock on the front door), identify themselves as police officers, and request consent to search for the suspected illegality or illicit items." *People v Frohriep*, 247 Mich App 692, 697; 637 NW2d 562 (2001).

court's findings were not clearly erroneous and that the coerciveness of the encounter constituted an unreasonable seizure of defendant's person. Further, the district court properly suppressed defendant's incriminating statements and the marijuana found in defendant's residence and dismissed the case. Accordingly, we affirm the circuit court's order affirming the district court's order of dismissal.

I. FACTS[2] AND PROCEDURAL HISTORY

At the preliminary examination, the prosecution presented only one witness,[3] a police officer, Captain Michael Compeau, who testified as follows. Approximately two weeks before he and another police officer initiated the knock and talk encounter with defendant, Compeau received a tip that defendant was storing marijuana at his residence. On several occasions during the intervening weeks, he conducted surveillance of defendant, but never observed anything that supported the tip. On the date of the incident, April 16, 2001, Compeau, along with four other police officers, went to defendant's residence at approximately 7:00 P.M. to conduct the knock and talk procedure.

At defendant's residence, Compeau and one other officer approached the front door and defendant admitted them into his residence. Just inside the front door, a three to four minute encounter took place between defendant and the officers, with Compeau apparently doing all of the talking for the two officers. Compeau informed defendant, who was initially upset by the presence of the officers, but soon calmed down and

---

[2] Because no trial has occurred in this matter, our recitation of facts is taken from the preliminary examination transcript.

[3] The prosecution also read into the record pertinent portions of the laboratory report on the evidence obtained from defendant.

became "gentleman[ly]," that they were police officers and that they had received a tip that marijuana was stored at his residence. Although defendant did not deny having marijuana, he "said no" to Compeau's request for permission to search the home. When questioned regarding whether defendant asked them to leave, Compeau responded, "He certainly did, yes." Compeau further related that "[defendant] put his hands up, and I said don't—don't touch me, [sic] and that's the time we started talking about the money."

Compeau initiated the conversation concerning money after defendant denied the officers consent to search and instructed them to leave both orally and by gesture directed at Compeau's person. The topic of money arose when Compeau asked defendant about the large bulge in defendant's rear pocket. While Compeau could not articulate when he first observed the bulge, he stated that he may have noticed it when he was conducting a pat-down search of defendant's person around the waist area for weapons "to protect myself" and because "[i]t's good police procedure and safety." However, Compeau also stated that nothing from the tip, his surveillance, or defendant's conduct at his residence gave Compeau reason to suspect that defendant would be armed with a weapon.

When Compeau asked defendant what was causing the large bulge in his rear pocket, defendant responded that he had sold a car that day for $6,500 and he offered to take Compeau to his car lot to verify the sale. Defendant rode to the car lot with Compeau and, once there, defendant was unable to verify that he sold a car that day. Eventually, defendant admitted having marijuana and took the officers back to his residence, where he opened his freezer, retrieved nine bags of marijuana that weighed 3.7 pounds, and gave them to the police.

Defendant voluntarily went to the police station with Compeau while other officers remained at defendant's house to conduct a more thorough search. While at the station, and without being advised of his *Miranda*[4] rights, defendant gave a tape-recorded statement[5] and later signed a consent to search form.[6]

Defendant was charged with possession with intent to deliver marijuana, MCL 333.7401(2)(d)(iii). At the preliminary examination, the district court dismissed the charge, finding that defendant's self-incriminating statements and the marijuana were obtained after police officers improperly failed to leave defendant's house. Specifically, the district court found that defendant denied permission to search and directed the officers both orally and by gesture to leave. Thereafter, by continuing to question defendant about the large bulge in his rear pocket, Compeau's conduct was inherently coercive because he was using an "indirect offer of force" and indicating that he was not leaving until "I get the information I want." Thus, the district court entered an order of dismissal of the charge against defendant.

The prosecution appealed the district court's order of dismissal to the circuit court, which affirmed the district court's order. The prosecution then filed with this Court a delayed application for leave to appeal the circuit court's order. This Court denied the prosecution's application "for lack of merit in the grounds presented." *People v Bolduc*, unpublished order of the Court of Appeals, entered June 17, 2002 (Docket No.

---

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[5] Defendant was fingerprinted at the police station before giving the tape-recorded statement.

[6] Compeau testified that during this entire incident, defendant was not under arrest.

241103). The prosecution then sought leave to appeal in the Supreme Court. As previously stated, in lieu of granting leave to appeal, our Supreme Court issued an order remanding the case to this Court for consideration as on leave granted. 467 Mich 900.

## II. STANDARD OF REVIEW

In *Frohriep, supra* at 702, we stated the standard of review when considering a trial court's ruling on a motion to suppress evidence:

> We review a trial court's findings of fact for clear error, giving deference to the trial court's resolution of factual issues. *People v Farrow*, 461 Mich 202, 208-209; 600 NW2d 634 (1999), quoting *People v Burrell*, 417 Mich 439, 448-449; 339 NW2d 403 (1983). "A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *People v Swirles (After Remand)*, 218 Mich App 133, 136; 553 NW2d 357 (1996). We overstep our review function if we substitute our judgment for that of the trial court and make independent findings. *Farrow, supra* at 209. However, we review de novo the trial court's ultimate decision on a motion to suppress. *People v Williams*, 240 Mich App 316, 319; 614 NW2d 647 (2000).

## III. LAW

While this Court held in *Frohriep, supra* at 697-698, that the knock and talk procedure is not unconstitutional per se, we noted that it is not without constitutional implications. Specifically, this Court stated that "a person's Fourth Amendment right to be free of unreasonable searches and seizures may be implicated where a person, under particular circumstances, does not feel free to leave or where consent to search is coerced." *Id*. at 698.

Both US Const, Am IV[7] and Const 1963, art 1, § 11[8] guarantee the right against unreasonable searches and seizures.[9] See also *Illinois v McArthur*, 531 US 326, 330; 121 S Ct 946; 148 L Ed 2d 838 (2001); *People v Kazmierczak*, 461 Mich 411, 417; 605 NW2d 667 (2000). In *Frohriep, supra* at 699-700, we explained:

> The Fourth Amendment protects people from unreasonable searches and seizures. *People v Faucett*, 442 Mich 153, 157-158; 499 NW2d 764 (1993). Stated another way, "[t]he lawfulness of a search or seizure depends on its reasonableness." *[People v] Snider*, [239 Mich App 393,] 406 [ 608 NW2d 502 (2000)]. Our Supreme Court has explained that "[t]he reasonableness of a Fourth Amendment seizure balances the governmental interest that justifies the intrusion against an individual's right to be free of arbitrary police interference." *Faucett, supra* at 158.

[7] The Fourth Amendment of the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[8] Section 11 of article 1 of the Michigan Constitution provides:

The person, houses, papers and possessions of every person shall be secure from unreasonable searches and seizures. No warrant to search any place or to seize any person or things shall issue without describing them, nor without probable cause, supported by oath or affirmation. The provisions of this section shall not be construed to bar from evidence in any criminal proceeding any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state.

[9] Michigan's constitutional prohibition against unreasonable searches and seizures is to be construed to provide the same protection as that secured by the Fourth Amendment of the United States Constitution, absent compelling reason to impose a different interpretation. *People v Green*, 260 Mich App 392, 396; 677 NW2d 363 (2004).

In order for any police procedure to have constitutional search and seizure implications, a search or seizure must have taken place. US Const, Am IV; Const 1963, art 1, § 11; *United States v Mendenhall*, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980) (opinion of Stewart, J.); see also *Florida v Royer*, 460 US 491, 498; 103 S Ct 1319; 75 L Ed 2d 229 (1983) (plurality opinion). As the Sixth Circuit Court of Appeals explained, "[t]he safeguards of the Constitution, with respect to police/citizen contact, will vest only after the citizen has been seized." *United States v Richardson*, 949 F2d 851, 855 (CA 6, 1991). The Sixth Circuit Court of Appeals agreed that " 'voluntary cooperation of a citizen in response to non-coercive questioning [raises no constitutional issues.]' " *Id.*, quoting *United States v Morgan*, 936 F2d 1561, 1566 (CA 10, 1991).

In *Terry v Ohio*, 392 US 1, 19, n 16; 88 S Ct 1868; 20 L Ed 2d 889 (1968), the United States Supreme Court stated:

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred".

Accord *Florida v Bostick*, 501 US 429, 434; 111 S Ct 2382; 115 L Ed 2d 389 (1991); *Mendenhall, supra* at 551-557.

Generally stated, the test for what constitutes a seizure is whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *INS v Delgado*, 466 US 210, 215; 104 S Ct 1758; 80 L Ed 2d 247 (1984), quoting *Mendenhall, supra* at 554 (Stewart, J.); *Michigan v Chesternut*, 486 US 567, 573; 108 S Ct 1975; 100 L Ed 2d 565 (1988); *People v Sasson*, 178 Mich App 257, 260-262; 443 NW2d 394 (1989). However, in situations where a person would have no desire to leave, such as where the person is seated on a bus, this test is not an accurate measure of the coercive

effect of an encounter with police.[10] Rather, "[i]n such a situation, the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick, supra* at 436. The *Bostick* Court stated, "We have said before that the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.* at 437, quoting *Chesternut, supra* at 569; see also *Kaupp v Texas*, 538 US 626; 123 S Ct 1843; 155 L Ed 2d 814 (2003); *People v Bloxson*, 205 Mich App 236, 242-244; 517 NW2d 563 (1994). The *Bostick* Court summarized:

> We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. That rule applies to encounters that take place on a city street or in an airport lobby, and it applies equally to encounters on a bus. [*Bostick, supra* at 439-440.]

Here, the knock and talk encounter took place at defendant's home, and a person's home garners special consideration in the law. " 'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Kyllo v United States*, 533 US 27, 31; 121 S Ct 2038; 150 L Ed 2d 94

---

[10] In *Bostick, supra* at 435, the United States Supreme Court stated that the state court erred "in focusing on whether Bostick was 'free to leave' rather than on the principle that those words were intended to capture."

(2001), quoting *Silverman v United States*, 365 US 505, 511; 81 S Ct 679; 5 L Ed 2d 734 (1961). " '[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton v New York*, 445 US 573, 585-586; 100 S Ct 1371; 63 L Ed 2d 639 (1980), quoting *United States v United States District Court*, 407 US 297, 313; 92 S Ct 2125; 32 L Ed 2d 752 (1972). "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton, supra* at 586; *People v Johnson*, 431 Mich 683, 691-692 n 5; 431 NW2d 825 (1988).

While searches and seizures without warrants are generally unreasonable per se under the Fourth Amendment and Const 1963, art 1, § 11, there are several exceptions, including consent. *People v Borchard-Ruhland*, 460 Mich 278, 293-294; 597 NW2d 1 (1999); *People v Brzezinski*, 243 Mich App 431, 433; 622 NW2d 528 (2000). Consent to search must be freely and voluntarily given and is based on an evaluation of the totality of the circumstances. *Borchard-Ruhland, supra* at 294. Consent is not voluntary if it is the result of coercion or duress. *Id.*

## IV. ANALYSIS

On appeal, the prosecution claims that "the [c]ircuit [c]ourt erred in affirming the [d]istrict [c]ourt's order of dismissal." In essence, the prosecution's position is that the district court clearly erred in finding that Compeau's questioning of defendant concerning the bulge in his pocket after defendant directed the officers to leave was inherently coercive and, therefore, constituted an illegal seizure of defendant's person. We disagree.

Compeau's testimony at the preliminary examination established that two officers confronted defendant

at his residence, identified themselves as police officers, and while inside defendant's home informed defendant that they had reason to believe that he was storing marijuana. Defendant responded by denying permission to search and by requesting, both orally and by gesture, that they leave the premises. Compeau ordered defendant to not touch him when defendant gestured toward him, apparently in an effort to get the officers to leave his home. Rather than leave, however, the officers turned their attention to a large bulge in defendant's rear pocket and asked defendant to explain it. The evidence also reveals that Compeau patted down defendant for weapons even though Compeau had no reason to suspect that defendant was armed with a weapon. Given this evidence, we cannot say that the district court clearly erred in finding that the circumstances, as they existed when the police failed to leave and instead persisted by asking defendant to explain a bulging pocket, were inherently coercive. By failing to leave defendant's home when requested to do so, the police officers suggested that they were in control of the situation and would not accept defendant's exercise of the right to preclude them from further activity at the home.

Further, a "seizure" occurs when a police officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Frohriep, supra* at 700, quoting *Terry, supra* at 20 n 16; see also *People v Lewis*, 251 Mich App 58, 68-69; 649 NW2d 792 (2002) (person is " 'seized' under the Fourth Amendment when a police officer has restrained the person's individual freedom"). At the pivotal moment in the present case, i.e., the point when the police could either leave as requested or defy that request, the police chose the latter course. Compeau admonished defendant not to touch him and then pursued a new line of inquiry

with defendant. What message does that send? The district court concluded, and we think rightly so, that this was an "indirect offer of force" indicating that they were not going away until "I get the information I want." A person who is the subject of that tactic in his own home has no recourse. As is well settled in the context of the law of self-defense, there is no place to retreat to when one is in his own home. See, e.g., *People v Riddle*, 467 Mich 116, 120-121, 134-135; 649 NW2d 30 (2002).[11] Unlike in a street encounter, a person such as defendant does not have the option of testing whether he is actually confined by the police by simply walking away. Where was defendant to go to avoid the intrusion of the police upon his own property? At that point, defendant had done everything that was reasonably

[11] In *Riddle, supra* at 134-135, our Supreme Court explained:

It is universally accepted that retreat is not a factor in determining whether a defensive killing was necessary when it occurred in the accused's dwelling:

"Regardless of any general theory to retreat as far as practicable before one can justify turning upon his assailant and taking life in self-defense, the law imposes no duty to retreat upon one who, free from fault in bringing on a difficulty, is attacked at or in his or her own dwelling or home. Upon the theory that a man's house is his castle, and that he has a right to protect it and those within it from intrusion or attack, the rule is practically universal that when a person is attacked in his own dwelling he may stand at bay and turn on and kill his assailant if this is apparently necessary to save his own life or to protect himself from great bodily harm. [40 Am Jur 2d, § 167, p 636.]" [Emphasis omitted.]

The rule has been defended as arising from " 'an instinctive feeling that a home is sacred, and that it is improper to require a man to submit to pursuit from room to room in his own house.' " *People v Godsey*, 54 Mich App 316, 319; 220 NW2d 801 (1974) (citations omitted). Moreover, in a very real sense a person's dwelling is his primary place of refuge. Where a person is in his "castle," there is simply *no safer place* to retreat. [Emphasis in original.]

possible for him to convey the message that the police were no longer welcome in his home. And despite his efforts, the message in return was that we are here until we decide to go, which is not until you have answered all our questions. A person in his own home ought not be placed in that situation by police action without being considered seized. In our judgment, the circumstances here leave no doubt that a reasonable person in defendant's position would have believed that he was not free to go about his home, and moreover, because of the police presence and action in his home, that person essentially lacked the ability to remove them from his home. Considering all the circumstances surrounding the knock and talk encounter, especially the fact that the police were in defendant's home and did not leave despite defendant's request and gesture, the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter. Clearly, defendant was not at liberty to ignore the police presence and go about his business. *Bostick, supra.* Consequently, under these circumstances we conclude that the police officers' persistence despite defendant's efforts to terminate the encounter resulted in defendant being seized in violation of his constitutional rights.

However, our analysis does not end here. The remaining question is whether the inherently coercive context in which defendant was seized entitles defendant to the relief of having his incriminating statements and the marijuana suppressed. Defendant's entitlement to relief is compromised by the fact, as the prosecution correctly points out, that defendant exhibited no reluctance to answer Compeau's question concerning the bulge in his pocket, quickly offered to verify his answer by taking Compeau to his car lot, was not

formally placed under arrest and made his incriminating statements to the police at the car lot, and voluntarily returned with the police and turned over to the police the marijuana in his freezer. Thus, the events that actually incriminated defendant took place at a point in time that was much later than the events that transpired at his home during the initial knock and talk encounter and, in part, at a different location. Moreover, all the incriminating events occurred during a period when there was no indication of a formal arrest or any subsequent coercive conduct by the police. Nevertheless, we conclude that defendant is entitled to the suppression of his incriminating statements and the marijuana. Defendant's conduct of apparent cooperation by answering the question and offering to accompany Compeau to his car lot was the product of the seizure of his person that resulted from the failure of the police to depart from his residence, and ultimately led to the retrieval of the marijuana and defendant making self-incriminating statements. Because this evidence ensued from the police officers' improper conduct in failing to leave when requested, they were properly suppressed as the fruit of the illegal seizure when the police officers failed to leave the house as requested by defendant. *Wong Sun v United States*, 371 US 471; 83 S Ct 407; 9 L Ed 2d 441 (1963) (suppression of unlawfully obtained evidence required when unlawful seizure not sufficiently attenuated or purged); *People v Cartwright*, 454 Mich 550, 557-558; 563 NW2d 208 (1997) (remedy for violation of the Fourth Amendment right against unreasonable searches and seizures is suppression of the unlawfully obtained evidence).

## V. CONCLUSION

In sum, while the police are free to employ the knock and talk procedure, *Frohriep, supra*, they have no right

to remain in a home without consent, absent some other particularized legal justification. A person is seized for purposes of the Fourth Amendment when the police fail to promptly leave the person's house following the person's request that they do so, absent a legal basis for the police to remain without the person's consent. Accordingly, we affirm the circuit court's order affirming the district court's dismissal of this case.

Affirmed.

DONOFRIO, J., concurred.

O'CONNELL, J. (*dissenting*). I respectfully dissent. For a Fourth Amendment violation to occur, defendant must be either physically or constructively seized.[1] No seizure occurred here, because defendant felt free to break off his contact with the police and ask them to leave his home—in fact he initially did so. The majority concludes that a three to four minute conversation with defendant concerning a bulge of money in defendant's pocket[2] amounted to a seizure of defendant's person. I disagree. I would reverse the lower court's decision.

Because defendant allowed the police into his home and initially offered to participate in their investigation, defendant was not seized. *People v Shankle*, 227 Mich

---

[1] I agree with the majority that police officers may not use the "knock and talk" procedure to bulldog a confession out of someone who merely complies with a request to speak with officers in his home. However, I disagree with the majority that the facts of this case reflect such an improper effort by police.

[2] The bulge in defendant's pocket was $6,500 in cash. Much of the officers' discussion with defendant concerned defendant's spurious explanation for carrying $6,500 in cash in his pocket. In my opinion, any reasonable police officer would grow suspicious and pursue this avenue of questioning when following up on a tip that the defendant was dealing narcotics.

App 690, 693; 577 NW2d 471 (1998). Nor did the
officers conduct a search of the premises during their
initial visit, so the Fourth Amendment's prohibition
against unreasonable searches and seizures simply
does not apply to the primary issue in this case. *Id.*
Moreover, the majority overlooks the essential touch-
stone for whether the police or prosecutor may use
information or consent a suspect provides in a knock
and talk scenario—voluntariness. A suspect who vol-
untarily offers information in response to police ques-
tioning is not, by definition, knuckling under to coer-
cive police tactics. It stands to reason that police may
properly use any information garnered from a consen-
sual dialogue such as the one the police chief initiated
in this case.[3] *Id.*

The record lacks any evidence that police officers
refused to leave defendant's home or otherwise threat-
ened to remain there until defendant provided a con-
fession. In fact, the police immediately left the home at
defendant's request when he offered to take them to his
car dealership. The police chief merely asked one more
question after defendant asked the officers to leave and
began ushering them to the door, and I can find no legal
authority for the proposition that an officer must cease
all questioning while leaving a lawfully entered home.[4]
I agree that a scenario in which an officer persistently

---

[3] I note that defendant never asked the police officers to stop asking
him questions; he only asked them to leave.

[4] The majority's conclusion to the contrary amounts to placing a gag
order on officers as soon as a homeowner asks them to leave. The
relationship between an effort to eject the officers and their interjection
of more questions is tenuous at best. Again, if the officers had refused to
leave until they received information or had exerted any other form of
coercion, those additional facts would certainly affect my finding that
defendant acted voluntarily. However, the timing and other circum-
stances surrounding this incident exonerate the officers of wrongdoing,
so the district court erred when it imposed the heavy sanction of
suppression. *People v Goldston*, 470 Mich 523; 682 NW2d 479 (2004).

questions a suspect while obstinately refusing to leave the suspect's home could qualify as trespassing, an unreasonable seizure of the home, and a coercive tactic worthy of the suppression sanction. MCL 750.552; US Const, Am IV; *Wong Sun v United States*, 371 US 471, 485-486; 83 S Ct 407; 9 L Ed 2d 441 (1963). However, none of these classifications applies to this case.

Rather than stand mute or reassert his desire for the officers' departure, defendant voluntarily, albeit dishonestly, answered the one last question the police chief posed. After defendant began the charade of going to his dealership, he did not express any desire to simply return to his house and end his participation with the investigation. In fact, unlike the typical "knock and talk" scenario, the officers left the home without obtaining defendant's consent to search the house or any valuable information that might lead to a warrant. Swingle & Zoellner, *"Knock and talk" consent searches: If called by a panther, don't anther*, 55 J Mo B 25, 26 (1999). Instead, they only gained defendant's consent to further participate in the investigation, which eventually garnered them a voluntary confession. In short, defendant failed to bear his burden of presenting any evidence that the police coerced his confession, or anything else, from him. Rather, defendant's invitation to enter the home, his response to the chief's question, his agreement to accompany the officers to his dealership, and, most importantly, his confession to the crime charged,[5] were all unforced and voluntary

---

[5] While not essential to my disposition of the case because I would find defendant's responses to the chief voluntary, I must also note that the confession in this case is not "fruit of the poisonous tree." The circumstances between defendant's confession and the chief's questioning in the house were separated by an extended period. Any pressure defendant felt to cooperate because he could not remove the officers from his home ended when he lured them away from the house. Under these circumstances, the link between the original confrontation and the confession was too attenuated to require suppression. *Wong Sun, supra* at 487-488.

actions.[6] Because the majority finds otherwise by reading nonexistent facts into this scant record, I must dissent.

---

[6] I also agree with the majority that defendant probably felt pressure to comply with the officers' requests, but I believe that pressure stemmed from the knowledge that he had hidden several pounds of marijuana a short distance from where the officers stood. While this anxiety over being caught in his wrongdoing undoubtedly clouded defendant's judgment and compelled him to account for his funds and lead the officers away from the house, the source of this compulsion was a pricked conscience, not the state. Therefore, I am convinced that the majority imputes defendant's impulses to the wrong source, and errs in the process.