**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JULY 18, 2007

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

No. 131276

WILLIE R. GILLAM,

      Defendant-Appellee.

BEFORE THE ENTIRE BENCH

TAYLOR, C.J.

At issue in this case is whether repeated requests by police officers for defendant to come out of his apartment constituted constructive entry into his home for Fourth Amendment purposes, thereby invalidating his arrest without a warrant and rendering subsequently obtained evidence inadmissible. We conclude that even if we were to adopt the constructive entry doctrine recognized by several federal circuit courts of appeals, defendant in this case would fail to establish that the police constructively entered his home in violation of his Fourth Amendment right to privacy. Accordingly, we reverse the judgment of the Court of Appeals

that held to the contrary and remand this case to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

Defendant's alleged accomplice was arrested after at least twice selling drugs to an undercover officer. On the basis of information gathered during the drug transactions, the police learned that defendant (who was on probation) was on a tether in his apartment, and determined that they had probable cause to arrest defendant. On March 30, 2004, three plain clothes officers and two uniformed patrol officers drove to defendant's apartment to effectuate the arrest. While one plain clothes officer, Officer Del Kostanko, watched the back terrace window in case defendant tried to flee, and one plain clothes officer, Officer Jerry Blow, stood behind a wall in the stairwell of the apartment building, the remaining plain clothes officer, Officer Donald Bey, and the two uniformed officers approached the front door of defendant's apartment and knocked.

Defendant testified that when the police knocked on the door, he checked to make sure his tether was not malfunctioning before he opened the door. He testified:

> [T]he police asked me to come out, I told them: No, I couldn't come out because I was on tether. We went back and forth. They kept telling me: Come out the door. I kept telling them: No, I'm on tether. We went back and forth, back and forth.

According to Officer Bey, the "back and forth" with defendant about coming out took place in a matter of seconds, and defendant was cooperative. Bey

2

did not recall defendant saying that he could not come out of his apartment because of the tether. Officer Blow stated that while he only heard bits and pieces of the conversation, he did not hear defendant say he could not come out because he was on a tether. Defendant claimed he eventually came out of the apartment "because there was an officer to my right. There was something about it that made me feel threatened. So I came on out and they arrested me." In any event, although he claimed that he was coerced, he admitted that he physically walked out of the apartment and that no officers touched him before he crossed the threshold.

Officer Bey testified that the entire arrest incident was calm, and no weapons were drawn. Officer Kostanko similarly testified that the arrest took place without incident and that defendant was cooperative. In contrast, when specifically asked, "Were people yelling, were people excited or was this fairly calm?" defendant testified that he "guessed" that the atmosphere was excited and it "could have been" excited.[1] Officers Kostanko and Bey both testified that after defendant was arrested, Kostanko entered the apartment at defendant's request to get defendant's coat and shoes. While inside, Officer Kostanko observed a piece

---

[1] The dissent claims that "[t]he uniformed police officers created an excited and coercive atmosphere," *post* at 8, that the instant facts "reveal excited, repeated demands for a person under house arrest to leave his residence," *id.* at 9, and that this establishes the coercive conduct necessary to find constructive entry. However, as clearly indicated from the testimony of the officers and not unequivocally repudiated by defendant himself, the atmosphere regarding the encounter at defendant's apartment door was calm.

of paper in plain view that contained the undercover officer's undercover name and telephone number, and he confiscated it as evidence.

At the preliminary examination, defense counsel objected to admission of the piece of paper on the ground that he believed the police could not enter defendant's apartment without a warrant. The preliminary examination was adjourned, and a suppression hearing was conducted, after which the trial court, evidently crediting defendant's version of the events, concluded that defendant was coerced into leaving his apartment and granted defendant's motion to suppress evidence of the piece of paper.[2]

---

[2] The dissent claims that the trial court did not clearly err when it found that an excited atmosphere existed. Contrary to the dissent's version of events, while the trial court credited defendant's version of events, defendant never unequivocally stated that there was an excited atmosphere, and the trial court did not explicitly find that there was an excited atmosphere. Rather, the trial court stated:

> Well, I listened to the evidence and . . . what is before the Court is this arrest which really troubles me. These officers had an address, had a name. They knew what the gentleman looked like. They went there, and I think they found it more expeditious than appropriate to just go there and arrest him on this probable cause they had from Officer Tran, who wasn't even present at the time of the arrest. . . . I believe they were told by Mr. Gillam: Look, I'm on tether. The gentleman has a record. He has a record here as long as my arm. So he certainly is familiar with the system. And I'm certain he knows the meets [sic] and bounds of a tether system. And he knows he was told, apparently he was told, he said he didn't want to step outside. He was somehow or other—the officers say he really steps outside. I find that hard to believe. *In any event, I think he was, in some manner or another, caused to step outside and be arrested.*

(continued…)

4

After the suppression hearing, the prosecutor moved to adjourn to allow him to consider whether to appeal the suppression decision. The trial court denied the motion. The next day, at what was to be the start of trial, the prosecutor cited the suppression decision along with the failure to obtain a plea from defendant's accomplice and respectfully declined to proceed. The trial court granted defense counsel's motion to dismiss, but the dismissal was without prejudice.

The prosecutor appealed the suppression decision and the dismissal in the Court of Appeals, which affirmed in an unpublished opinion per curiam, issued

---

(…continued)

Thus, there was no "finding" of an excited atmosphere and, accordingly, any assessment of trial court error, much less clear error, in a "finding" the court never made is not possible.

Nevertheless, the dissent also claims that the "trial court's finding that there was a coercive environment was not clearly erroneous, given the quantity and weight of the testimony that supported it." *Post* at 7 n 12. If, as the dissent contends, *id.*, the trial court "explicitly" found there was a coercive environment when it stated, "He was somehow or other—the officers say he really steps outside. I find that hard to believe. In any event, I think he was, in some manner or another, caused to step outside and be arrested," the trial court's conclusion would be clearly erroneous because the finding was contrary to the testimony of the officers as well as defendant. As previously noted, the officers essentially testified that defendant was cooperative and stepped outside when asked, and defendant himself acknowledged that he physically walked out of the apartment and that no officers touched him before he crossed the threshold. Moreover, defendant could not identify any specific statement or action by an officer that would indicate coercion; rather, he testified generally that the officers kept telling him to come outside, and that something about the officer standing to his right made him feel threatened. To the extent the trial court found that the officers created a coercive environment, the clear error in such finding is apparent where the trial court itself was unable to articulate how the officers' actions or statements were coercive.

5

April 4, 2006 (Docket No. 259122). The Court explained that (1) the evidence was suppressed not because it was seized without a search warrant but because defendant was arrested without an arrest warrant, and (2) while a warrant is not needed to arrest someone on probable cause outside the person's home, a warrant is required, absent exigent circumstances, to arrest someone inside the person's home. It phrased the issue as whether "the trial court had a reasonable evidentiary basis for concluding that the police actually coerced defendant to leave his place of residence and thus expose himself to [an arrest without a warrant]." Slip op at 2. After reciting defendant's testimony, the Court of Appeals stated:

> [The prosecutor] argues that defendant did not describe any actual coercion, but that he left the apartment voluntarily. However, defendant did describe his reluctance to leave because of his tether. The trial court credited this testimony, and observed that defendant was in a position to understand the implications of breaking that tether. Defendant additionally described a pattern of repeated police entreaties to leave the apartment. Such persistence on the part of uniformed police officers in response to defendant's initial stated disinclination to leave the premises could reasonably be taken to constitute actual coercion. [*Id.*]

The prosecutor applied in this Court for leave to appeal. We granted leave to appeal, asking the parties to address, among the issues to be briefed, whether the police conduct "constituted a constructive entry into a citizen's home for purposes of a Fourth Amendment search and seizure analysis." 477 Mich 969 (2006).

6

## II.  STANDARD OF REVIEW

The scope of the constructive entry doctrine and whether the police conduct in the instant case constituted a constructive entry of defendant's dwelling raises Fourth Amendment implications.  Issues of constitutional dimension are reviewed de novo.  *People v Drohan,* 475 Mich 140, 146; 715 NW2d 778 (2006).  A trial court's factual findings are generally reviewed for clear error.  *People v Williams,* 475 Mich 245, 250; 716 NW2d 208 (2006).

## III.  ANALYSIS

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.  [US Const, Am IV.]

In *Payton v New York,* 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980), the United States Supreme Court held that the police were prohibited by the Fourth Amendment from entering a suspect's home without a warrant or consent for the purpose of making an arrest.  *Id.* at 576.  In doing so, it noted that the amendment applied equally to seizures of persons and to seizures of property, and that the chief purpose was to protect against physical entry of the home.  *Id.* at 587.  The Court summarized:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.    Absent exigent circumstances, that

7

threshold may not reasonably be crossed without a warrant. [*Id.* at 590.]

Hence, *Payton* prohibited only the actual physical entry by the police into a suspect's home. Since *Payton,* however, the Sixth Circuit Court of Appeals has expanded the bar against actual physical entry to encompass situations involving constructive entry, which occurs when a suspect leaves his or her home in response to coercive police conduct. *United States v Morgan,* 743 F2d 1158, 1166 (CA 6, 1984). The Third, Ninth, and Tenth circuit courts of appeals have likewise recognized the doctrine of constructive entry. *Sharrar v Felsing,* 128 F3d 810, 819 (CA 3, 1997); *United States v Al-Azzawy,* 784 F2d 890, 893 (CA 9, 1985); *United States v Maez,* 872 F2d 1444, 1450 (CA 10, 1989).

However, several other federal circuit courts of appeals have declined to adopt the doctrine, and the United States Supreme Court has yet to address the issue. *United States v Carrion,* 809 F2d 1120, 1128 (CA 5, 1987); *United States v Berkowitz,* 927 F2d 1376, 1386 (CA 7, 1991); *Knight v Jacobson,* 300 F3d 1272, 1277 (CA 11, 2002). Although state courts are bound by United States Supreme Court decisions construing federal law, they are not similarly bound by the decisions of the lower federal courts, and when there is a conflict of authority among the lower federal courts, this Court is free to follow the authority it deems the most appropriate. *Abela v Gen Motors Corp,* 469 Mich 603, 606; 677 NW2d 325 (2004). Indeed, even when there is no conflict among the lower federal courts, we are free to follow or reject their authority. *Id.* at 607.

8

Amicus curiae, the Prosecuting Attorneys Association of Michigan (PAAM), urges us to reject the constructive entry doctrine. It argues that (1) the Unites States Supreme Court has always held that probable cause rather than a warrant is required for an arrest; (2) in *Payton, supra,* the Court held that a warrant was required *not* to accomplish the arrest, but rather to invade the privacy of the dwelling; and (3) *Morgan* and its progeny have erred in focusing on *arrests* without a warrant when the concern expressed in *Payton* was the *crossing of thresholds* without a warrant. However, we need not decide whether to adopt the constructive entry doctrine in this case because, even assuming that the constructive entry doctrine applies, we conclude that defendant here has not established that the police constructively entered his apartment in violation of his Fourth Amendment right to privacy.

Unlike the siege tactics employed in *Morgan, supra* at 1161, 1164, namely the encircling of the suspect's house with nine officers and several patrol cars, the strategic blocking of the suspect's car with one of the patrol cars, and the use of floodlights and a bullhorn in the dark of night to summon the suspect from the home, the actions of the officers in the instant case, according to defendant himself, merely involved knocking on his front door and asking him to step outside.[3]

---

[3] Although there were five officers at the scene, defendant testified that there were only three at his front door at the time he opened it.

Similarly, the facts of this case do not approach those of *United States v Saari*, 272 F3d 804, 806-807 (CA 6, 2001), in which four officers, with weapons drawn, surrounded the only entrance to the defendant's apartment, one officer carried a shotgun, and the officers announced, "Police." When the defendant opened the door, he was instructed to come outside. He testified that he walked outside with his hands in the air because he was afraid of being shot. In suppressing the evidence seized incident to the arrest, the *Saari* court gave several examples of situations in which a reasonable person would not believe that he or she was free to leave:

> "[T]he threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." [*Id.* at 808, quoting *United States v Mendenhall*, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980).]

In the instant case, while there was one more officer at the scene than in *Saari*, there was one less officer at defendant's door, and there is no indication that defendant knew of the presence of the other two officers at the time he left the apartment. Of the three officers at his door, only two were in uniform. This did not constitute an overwhelming show of force. Further, there was no evidence that the officers drew their weapons or used language that indicated that defendant might be compelled to leave his apartment, and defendant specifically testified that they did not touch him until after he crossed the threshold.

Nor did the officers' behavior approach that of the officers in *Al-Azzawy,*

10

*supra* at 893 (the police completely surrounded the trailer with weapons drawn and, with a bullhorn, ordered the suspect to leave the trailer and drop to his knees), or *Sharrar, supra* at 819 (the police surrounded the house, pointed machine guns at the windows, and ordered the suspects to come out). Each of those cases involved overbearing police tactics.

Here, rather, the officers acted consistently with those in *United States v Thomas,* 430 F3d 274, 276 (CA 6, 2005), in which four officers approached the suspect's house in the daytime, two at the front door and two at the back door (which served as the primary entrance to the house), while one officer stayed in a patrol car; the two who approached the primary entrance knocked, asked the suspect to step outside when he answered the door, and arrested him when he refused to speak with them. The Sixth Circuit found no Fourth Amendment violation because "the police officers did not enter the house and . . . defendant . . . did not exit the house as a result of physical force or any other conspicuous show of authority by the police." *Id.* at 275.

The court noted that consensual encounters between the police and citizens were permitted, and they did not become nonconsensual merely because they took place at the entrance of someone's home. *Id.* at 277. The court explained that the difference between a consensual encounter and a constructive entry is the show of force by the police. *Id.*

Lastly, the court reasoned that the number of officers present did not always indicate coercion; in finding that four officers was reasonable, the court

11

noted the potential danger of approaching a house believed to contain a drug operation and stated that the officers were permitted to take reasonable security precautions. *Id.* at 280. Similarly here, the three officers approached defendant's apartment to arrest him for conspiracy to deliver controlled substances. While one of the officers testified that he did not expect to find evidence of drug trafficking in the apartment because defendant was on probation and, thus, was subject to random searches by his probation officer, the potential for danger still existed, and the officers reasonably sent three officers to defendant's door.

Moreover, while defendant claims he was coerced into leaving his apartment by the repeated requests of the officers, he fails to indicate how a second request that he step out of the apartment is any more coercive than a single request. And, as noted in *Thomas,* an officer's request that an individual step out of his house to speak with the officer is not coercive. Additionally, defendant failed to identify any specific statements of compulsion. Compare, for example, the case of *Boykin v Van Buren Twp,* 479 F3d 444 (CA 6, 2007), in which the circuit court noted in a footnote that if the plaintiff had brought a claim alleging violation of his Fourth Amendment rights as a result of a constructive entry by the police, instead of bringing a civil rights action under 42 USC 1983, he likely would have had considerably more success. *Id.* at 450 n 2. In doing so, it found the following comments demonstrated an unequivocal show of force, "'I'm trying to avoid coming into your home and dragging you out of your home. . . . And we're going to do that if you don't listen to us.'" *Id.* The statements in *Boykin*

indicate that had the suspect not complied, the police would have physically compelled his compliance. In contrast here, defendant merely testified that the "Police said come out . . . . They kept telling me to come out the door." These statements do not threaten the use of physical force to compel compliance or, in fact, threaten in any manner.[4]

Although this case is somewhat complicated by the fact that defendant wore a tether and initially refused to leave the apartment, the suspect in *Boykin* apparently also refused to leave his home. While the tether may have given defendant a greater incentive to stay in his apartment, this alone does not lead to a presumption that defendant's will was overborne by a show of police force. Rather, the tether, backed by a court order to remain in the apartment, instead of supplying a basis for a reasonable person to have felt coerced to leave his apartment as claimed by the dissent, would seem to provide more resolve to the person wearing it to remain inside. In other words, armed with a court order, defendant should have felt reasonably confident in refusing police requests that he leave the apartment. Thus, with the caselaw we have discussed in mind, it being

---

[4] The dissent claims that we have missed a crucial part of the dicta in *Boykin* that "recognized that coercive statements alone could invoke the constructive entry doctrine." *Post* at 10. We reiterate that we have not yet decided whether to adopt the constructive entry doctrine in Michigan. Even assuming arguendo that the constructive entry doctrine as articulated by the Sixth Circuit in *Boykin* were to apply, however, no coercive statements were made in this case. It is, therefore, unnecessary to decide whether coercive statements alone can invoke the constructive entry doctrine.

13

clear that there was no improper entry, constructive or otherwise, defendant was arrested legally, and the trial court erred in suppressing evidence of the piece of paper containing the undercover officer's name and telephone number.

## IV. CONCLUSION

In summary, even if we were to recognize the constructive entry doctrine, defendant in this case would fail to establish that that police constructively entered his home in violation of his Fourth Amendment right to privacy. Accordingly, we reverse the judgment of the Court of Appeals and remand this case to the trial court for proceedings consistent with this opinion.

Reversed and remanded to the trial court.

Clifford W. Taylor
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

S T A T E   O F   M I C H I G A N

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v                                         No. 131276

WILLIE R. GILLAM,

      Defendant-Appellee.

_____

WEAVER, J. (*concurring in the result only*).

I concur in the majority's holding that, if the constructive entry doctrine were to be adopted in Michigan, defendant Gillam would not be able satisfy the requirements of the doctrine under the facts of this case. I write separately to offer a different analysis, truer to the purpose of the Fourth Amendment of the United States Constitution, with regard to why the constructive entry doctrine does not apply in this case.

The constructive entry doctrine is derived from the Fourth Amendment, which protects the right of people to be secure in their homes. US Const, Am IV. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. [*Id*.]

In the context of arrests, the United States Supreme Court has established that under the Fourth Amendment, a warrant is required before the police can enter a home to arrest a person, absent any exigent circumstances. *Payton v New York*, 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980). In *Payton*, the Court stated that "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.*

While the holding in *Payton* protects people's Fourth Amendment rights in situations where the police physically enter a home, some courts have expanded on *Payton* to provide Fourth Amendment protection when the actions of the police lead to a constructive entry of a home. The constructive entry doctrine has been adopted by several federal circuit courts of appeals, including the Sixth Circuit Court of Appeals, to deal with situations in which a person was arrested outside his or her home after police conduct compelled that person to leave the home.[1]

Both the majority and the dissent characterize the constructive entry doctrine as applying when a person is arrested after the police use coercive[2] conduct that would compel a reasonable person to comply with the police and

---

[1] See *United States v Morgan,* 743 F2d 1158, 1166 (CA 6, 1984); *Sharrar v Felsing,* 128 F3d 810, 819 (CA 3, 1997); *United States v Al-Azzawy,* 784 F2d 890, 893 (CA 9, 1985); *United States v Maez,* 872 F2d 1444, 1450 (CA 10, 1989).

[2] To coerce is to compel by force or threat. Black's Law Dictionary (7th ed).

leave his or her home. I generally agree with this characterization, but I find that the Fourth Amendment requires an application of the doctrine that focuses on police conduct with regard to crossing the threshold of the home rather than a person's belief that he or she must comply with an officer's request to leave his or her home. Any application that places more emphasis on a person's compliance with an officer's request, and less emphasis on the Fourth Amendment's protection of the home, undermines the Fourth Amendment and creates too broad of a doctrine. In applying the constructive entry doctrine, one should look to the facts of the case only to determine whether the police compelled the person into leaving his or her home by a show of force or threats *to cross the threshold into the person's home*.

The majority and the dissent argue over whether the facts of this case show that the police created an excited atmosphere that would have compelled defendant to leave his apartment. The more relevant question regarding constructive entry is whether the police actually displayed a show of force or made threats that would lead a reasonable person to believe that if defendant did not come out of his apartment, the arresting officers would actually cross the threshold of the apartment to retrieve him.

Under the facts of this case, there appears to be no way in which the actions of the police could lead a reasonable person to believe that the police would have crossed the threshold of the apartment to arrest defendant. According to the testimony of defendant and the arresting officers, the only actions of the police

3

were to approach defendant's apartment and ask him to come out.[3]  Any other

facts that relate to the atmosphere surrounding the arrest and whether defendant

believed he needed to leave his apartment at the request of the police are not as

relevant as the actions of the police under the test for constructive entry as stated

above.[4]  Because this case lacks any fact showing that the police made a show of

force or threatened to enter defendant's apartment,

---

[3] Although there were several police officers standing outside defendant's door, and they asked defendant to come out even after he first refused, these facts do not show that the police at any time threatened to enter defendant's apartment to arrest him.  Absent any condition indicating that the officers would enter the apartment, the number of officers present outside defendant's apartment is not relevant to the issue: one police officer or ten police officers could enter into an apartment to arrest someone.

[4] Although the majority and the dissent state that the presence of defendant's tether may have contributed to a coercive environment, my test does not give much weight to the environment surrounding the arrest.  Because the focus should be on the actions of the police and whether the police acted with a show of force or threat to invade the home, the presence of the tether and defendant's reasonable belief that his tether restricted him to stay in his apartment does not factor into any decision regarding constructive entry.  Rather, if the tether were to factor into the Fourth Amendment analysis of this case, the presence of the tether may actually reduce defendant's subjective and objective expectation of privacy in his home under the Fourth Amendment.  See *United States v Smith*, 457 F Supp 2d 802 (ED Mich, 2006).  The tether allows the police to monitor his movements at all times, including when he is in his home. If the police had improperly entered defendant's apartment, such entry would necessitate an analysis of defendant's expectation of privacy under the Fourth Amendment.  However, because the police did not improperly enter defendant's home,
(continued…)

the constructive entry doctrine need not be applied in this case.  Thus, I concur in the result reached by the majority.

Elizabeth A. Weaver

---

(…continued)
constructively or otherwise, an analysis of defendant's expectation of privacy is not necessary.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellant,

v

No. 131276

WILLIE R. GILLAM,

      Defendant-Appellee.

_____

KELLY, J. (*dissenting*).

The issue here is whether certain police conduct constituted a constructive entry into defendant's home, violating the Fourth Amendment of the United States Constitution, invalidating the arrest, and rendering inadmissible the evidence later obtained.

The constructive entry doctrine is widely recognized. It is applicable in the instant case where the police created an excited environment and refused to respect defendant's repeated refusals to leave his home. Accordingly, I would affirm the judgment of the Court of Appeals and hold that the trial court properly suppressed the evidence that was seized after defendant's arrest.

THE APPLICABLE STANDARDS OF REVIEW

This Court reviews legal conclusions de novo and a trial court's findings of fact at a suppression hearing for clear error. *People v Williams*, 472 Mich 308,

313; 696 NW2d 636 (2005).[1]  Constitutional questions are reviewed de novo.

*Michigan Chiropractic Council v Comm'r of the Office of Financial & Ins Services*, 475 Mich 363, 369; 716 NW2d 561 (2006).

THE CONSTRUCTIVE ENTRY DOCTRINE

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.  [US Const, Am IV.]

In Michigan, the police do not generally need a warrant to arrest a person when they have probable cause to believe that the person has committed a felony. *People v Johnson*, 431 Mich 683, 690-691; 431 NW2d 825 (1988).  MCL 764.15(1) lists the circumstances under which a police officer may effectuate an arrest without a warrant.[2]  However, a warrant is generally required to arrest a person in his or her home.

---

[1] I note that the Sixth Circuit Court of Appeals has concluded that the legal finding that a seizure occurred is reviewed de novo; the underlying factual findings are reviewed for clear error.  See *United States v Buchanon*, 72 F3d 1217, 1222-1223 (CA 6, 1995).

[2] In the instant case, it is undisputed that the police did not obtain an arrest warrant before arriving at defendant's apartment.  However, at the suppression hearing, the trial court determined that the police had probable cause to get an arrest warrant.  I will assume that the police had probable cause to believe that defendant committed a felony and therefore could have effectuated a lawful arrest without a warrant.

In *Payton v New York*,[3] the United States Supreme Court held that the Fourth Amendment prohibits the police from making a nonconsensual entry into a suspect's home without a warrant in order to make a routine felony arrest. *Payton*, 445 US 573 at 576. The Court stated that "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Id.* at 585, quoting *United States v United States District Court*, 407 US 297, 313; 92 S Ct 2125; 32 L Ed 2d 752 (1972).

The Court further recognized that it is a "'basic principle of Fourth Amendment law'" that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton*, 445 US at 587 (citation omitted). The Court specifically drew the line between searches and seizures that do not violate the Fourth Amendment and those that do. The line was drawn at the entrance to the home:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[at] the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." [*Silverman v United States*, 365 US 505, 511; 81 S Ct 679; 5 L Ed 2d 734 (1961).] In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent

---

[3] 445 US 573; 100 S Ct 1371; 63 L Ed 2d 639 (1980).

3

circumstances, that threshold may not reasonably be crossed without a warrant. [*Id*. at 589-590.]

Numerous courts have interpreted *Payton* as prohibiting not only physical entries into a person's home to effectuate an arrest without a warrant, but constructive entries as well. The Third Circuit Court of Appeals, in *Sharrar v Felsing*,[4] found a constructive entry where there was a "clear show of physical force and assertion of authority." In *United States v Morgan*,[5] the Sixth Circuit Court of Appeals stated that either a constructive entry or a direct entry into the home would constitute an arrest. The Ninth Circuit Court of Appeals in *United States v Al-Azzawy*,[6] found a constructive entry where the suspect was not free to leave, his movement was restricted, and the officers' show of force and authority was overwhelming. The Tenth Circuit Court of Appeals in *United States v Maez*,[7] found that *Payton* is violated where there is "such a show of force that a defendant comes out of a home under coercion and submits to being taken into custody."[8]

---

[4] 128 F3d 810, 819 (CA 3, 1997).

[5] 743 F2d 1158, 1166 (CA 6, 1984).

[6] 784 F2d 890, 893 (CA 9, 1985).

[7] 872 F2d 1444, 1451 (CA 10, 1989).

[8] A number of courts have not had the opportunity to discuss the constructive doctrine entry. See, e.g., *United States v Beudoin*, 362 F3d 60, 68 (CA 1, 2004), citing *Joyce v Town of Tewksbury*, 112 F3d 19 (CA 1, 1997) (noting that a there is no settled answer to the constitutionality of doorway arrests), and *United States v Gori*, 230 F3d 44, 52 n 2 (CA 2, 2000) (declining to address the questions presented when the police surround a dwelling, flood it with search lights, and order evacuation over a bullhorn).

(continued…)

4

The constructive entry doctrine is a valid legal doctrine that protects individual liberties and safeguards individuals' Fourth Amendment rights. It respects the United States Supreme Court's decision in *Payton*, which drew a "firm line at the entrance to the house." *Payton*, 445 US at 590. Equally important, the constructive entry doctrine recognizes that officers cannot do through coercive tactics and the abuse of authority what they cannot do physically: they cannot enter someone's home to effectuate an arrest without a warrant. As noted by the Sixth Circuit Court of Appeals, "[a] contrary rule would undermine the constitutional precepts emphasized in *Payton*." *United States v Morgan*, 743 F2d 1158, 1116 (CA 6, 1984).

Application of the constructive entry doctrine inherently requires a case-by-case analysis to determine whether the police conduct constituted a constructive entry. A majority of this Court concludes that the conduct in this case did not constitute a constructive entry. It arrives at this conclusion by noting that the facts are not as egregious as those in other cases. Here, the police did not use

---

(…continued)

Other courts have indicated that the Fourth Amendment is not violated as long as the officers do not cross the physical threshold of the entrance to the home. See, e.g., *United States v Carrion*, 809 F2d 1120, 1128 (CA 5, 1987) (holding that *Payton* was not violated when the police, without crossing the threshold, pointed guns at and arrested the defendant when he was still in a hotel room), and *United States v Berkowitz*, 927 F2d 1376, 1386 (CA 7, 1991) (*Payton* prohibits an entry into a home without a warrant, not an officer's use of his or her voice to convey a message of arrest from outside the home).

5

floodlights and bullhorns[9] or draw their weapons and place defendant in fear of being shot.[10] However, unlike the majority, I believe that a defendant's Fourth Amendment rights may be violated even though the police conduct was less egregious than that in the most extreme factual settings.

The decision should be made on the basis of the degree of coerciveness of the police conduct. The most relevant question is whether a reasonable person would feel compelled to leave the house.[11]

---

[9] *Morgan*, 743 F2d at 1161, 1164.

[10] *United States v Saari*, 272 F3d 804, 806-807 (CA 6, 2001).

[11] See *United States v Thomas*, 430 F3d 274, 278 (CA 6, 2005) (there was no constructive entry where there was no indication that "a reasonable person, confronted with a knock on the door by police officers, would believe without more that he was either under arrest or otherwise compelled to leave the house"); *Sharrar*, 128 F3d at 819 (no reasonable person would have believed himself free to remain in the house when the police surrounded the house, pointed machine guns at the windows, and ordered the occupants out).

Justice Weaver agrees that the constructive entry doctrine applies when a person is arrested after the police engage in coercive conduct that would compel a reasonable person to leave his or her home. However, she proposes a new test for determining whether a constructive entry has occurred and the Fourth Amendment has been violated. Under her theory, a constructive entry occurs when the police conduct would lead a reasonable person to believe that he or she must step outside his or her home. Otherwise, it must appear to the person, the officers would cross the threshold to arrest him or her. I cannot agree that the police may use any degree of coercive conduct or threats so long as they stop short of indicating that they will physically cross the threshold. Under Justice Weaver's test, the police could station machine guns, bullhorns, floodlights, and barking attack dogs outside a person's door indefinitely. As long as they did not threaten to physically cross the threshold of the person's home, there would be no constructive entry. It seems beyond argument that the Fourth Amendment affords greater protection than that.

In this case, the trial court believed defendant's version of the events. Defendant explained that, at the time in question, he had been confined to his apartment on house arrest and was on a tether. The police knocked on his door. He opened it, and the police asked him to come out. According to defendant, he replied that he could not come out because he was on a tether. It is undisputed that there was a repeated verbal exchange between the police and defendant in which the police told defendant to come out and he declined to do so. Defendant eventually emerged from the apartment "because there was an officer to [his] right [and] something about it [made him] feel threatened." Defendant testified that he came out in what he described as an exited atmosphere,[12] that he did not leave his apartment voluntarily, and that he felt coerced by the officers.

---

[12] The majority takes issue with my characterization of the situation as an excited atmosphere. Defendant testified that the situation could be described as an excited atmosphere and, as recognized by the majority, the trial court believed his version of the events.

I do not find credible the majority's view that the police made no coercive statements to defendant. Even assuming that the officers' requests to defendant that he step outside were polite, by dint of their persistent repetition, they became coercive. That combined with the excited atmosphere created by the police, and the fact that defendant was on tether, enhanced the coercive environment. As recognized by the majority, the trial court stated, "In any event, I think [defendant] was, in some manner or another, caused to step outside and be arrested." Therefore, the trial court explicitly found that the police coerced defendant into leaving his apartment. The trial court's finding that there was a coercive environment was not clearly erroneous, given the quantity and weight of the testimony that supported it. The trial court, not the majority of this Court, was in the best position to judge the credibility of the witnesses and make findings of fact.

7

Given these facts, I would conclude that the police made a constructive entry. The uniformed police officers created an excited and coercive atmosphere. They refused to acknowledge or respect defendant's repeated refusals to leave his apartment. They made it clear that they would not take "no" for an answer and would continue to ask defendant to step out despite his repeated refusals to do so.

Moreover, before the police arrived at defendant's door, they knew that he was on house arrest with a tether. When they called out to him, defendant told them that he could not leave his apartment because he was on a tether. At the suppression hearing, the trial court believed defendant's testimony and noted that defendant knew the "meets [sic] and bounds" of the tether system. Moreover, when questioned by the trial court, an officer admitted that it was possible that defendant's tether had been set up so that he could not leave the apartment.

The fact that defendant was on a tether further supports the finding that there was a constructive entry. Defendant was under a court order to remain in his apartment, and yet the police officers repeatedly demanded that he leave it. Under this situation, a reasonable person would have felt coerced to leave his or her residence.[13] The majority contends that the facts of this case are similar to those in

---

[13] The Michigan Court of Appeals has addressed what constitutes coercive conduct in a traditional knock-and-talk setting. In *People v Bolduc*, 263 Mich App 430, 441; 688 NW2d 316 (2004), the defendant testified that, after the police came to his home, he denied them permission to search his residence and requested that they leave the premises. The police ignored the defendant's repeated requests to leave his home and instead continued to question him. *Id.* The Court of Appeals found that the police officers' action constituted inherently coercive conduct. *Id.*

(continued…)

8

*United States v Thomas*,[14] in which the Sixth Circuit Court of Appeals concluded that there was no constructive entry. In that case, officers knocked on the door of the defendant's residence. *Id.* at 276. When the defendant opened the door, the officers told him that the investigators wanted to talk to him and asked him to come out of the residence. *Id.* Without objection, the defendant came out of the residence, and the police arrested him. *Id.*

There are several important distinctions between the facts in *Thomas* and those in the instant case. In *Thomas*, the police made only one request of the defendant, who was not under house arrest, to come out of the residence. In the instant case, the police knew that defendant was under house arrest and refused to accept his repeated refusals to leave his residence. Unlike in *Thomas*, the instant facts do not reveal a calm single request to leave the residence. Rather, they reveal excited, repeated demands for a person under house arrest to leave his residence.

The majority attempts also to distinguish the instant case from *Boykin v Van Buren Twp*, 479 F3d 444 (CA 6, 2007). In *Boykin*, the police came to the

---

(…continued)

This Court has not yet discussed the constitutionality of, or limits to, traditional knock-and-talk encounters. See *People v Frohriep*, 466 Mich 888 (2002) (Kelly, J., dissenting). In any event, the *Bolduc* decision indicates the willingness of the Court of Appeals to recognize that repeated refusals by police officers to leave a suspect's home when requested constitute coercive conduct.

[14] 430 F 3d 274 (CA 6, 2006).

defendant's house and stated, among other things, "'I'm trying to avoid coming into your home and dragging you out of your home . . . . And we're going to do that if you don't listen to us.'" *Id.* at 450 n 2. The Sixth Circuit Court of Appeals opined that, had the issue been briefed, the Court would have been inclined to find a constructive entry into the defendant's home in violation of *Payton. Id.*

In attempting to distinguish the instant facts from those of *Boykin*, the majority misses a crucial part of the *Boykin* commentary. Specifically, the Sixth Circuit recognized that coercive statements alone could invoke the constructive entry doctrine. This recognition necessarily belies the majority's inference that only overt physical acts, such as using a bullhorn or brandishing machine guns, could constitute a constructive entry.

It should be noted, also, that the majority opinion risks establishing bad public policy. It discourages people from opening their door to police officers. Essentially, it signals to the public that it is acceptable for the police to ignore a person's repeated refusals to leave his or her home and sanctuary. Hence, people might conclude that they should not open their doors when they see police officers on the other side. This Court should encourage, not discourage, the public to assist the police in their lawful investigations.[15]

---

[15] The majority claims that the tether would provide more resolve to the person wearing it to remain inside. However, as noted above, defendant did initially display his resolve to remain in the apartment, and the officers refused to respect it. It is apparent from the fact of the tether that defendant had prior contact with the police and the court system. Presumably, the judge who ordered the

(continued…)

10

CONCLUSION

For the reasons I have discussed, I would affirm the judgment of the Court of Appeals and hold that the trial court properly excluded the evidence seized. A constructive entry occurred when the police created an excited environment and coerced defendant who was on a tether into leaving his apartment in order to arrest him.

                                    Marilyn Kelly
                                    Michael F. Cavanagh

---

(…continued)
tether encouraged him to cooperate with the police while on the tether. The majority's opinion encourages both those who do and do not have an ongoing relationship with the court system to ignore police requests.

11